IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**09CV0006**
**JUDGE HOLDERMAN**
**MAG.JUDGE ASHMAN**

UNITED STATES ex rel.
LAURA LITTERIO
and
the State of ILLINOIS,

:      FILED IN CAMERA AND
       UNDER SEAL

**Plaintiffs**      :

:      **JURY TRIAL DEMANDED**

**v.**      :

:

SUPERIOR HOME HEALTH, LLC,      :
     a/k/a/ G.O.L.D.E.N. Light      :
     and      :
WEST SIDE COMMUNITY HOSPITAL, INC.      :
d/b/a SACRED HEART HOSPITAL      :
     and      :
EDWARD J. NOVAK      :
     and      :
BASHI BANDARI, MD      :
     and      :
JAMES M. CARUSO, MD      :
          **Defendants**      :

*F I L E D*

JAN – 5 2009

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT,**
**THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT,**
**FEDERAL AND STATE ANTI-KICKBACK STATUTES, AND THE STARK LAW**

## I.    INTRODUCTION

1.      Qui Tam Relator Laura Litterio brings this action on her own behalf and on

behalf of the United States of America and the State of Illinois to recover damages and

penalties under the False Claims Act, 31 U.S.C. § 3729, *et. seq.*, and under the Illinois

Whistleblower Reward and Protection Act, 740 ILCS 175/1, et. seq., against Defendants

Superior Home Health, LLC, a/k/a G.O.L.D.E.N. Light, West Side Community Hospital,

of both Superior Home Health and Sacred Heart Hospital, and the named physicians who worked at Sacred Heart Hospital and its affiliated clinics and who referred patients to Superior Home Health.

2.     Relator's allegations relate to home health services Defendant Superior Home Health, LLC, provided to beneficiaries of federal and state-funded health care programs, including Medicare and Medicaid, living in and around Chicago, Illinois.

3.     Defendants' violations of applicable home health services standards resulted in substandard care or denial of care to the aged and infirm Medicare and Medicaid patients entrusted to Defendant Superior. Recent statistics show that Superior's patients fall far below state and national standards in terms of their ability to remain at home following an episode of home health care.

4.     Superior Home Health was formed, in great part, to take advantage of the ability of Defendant Sacred Heart Hospital's principal investor, President and CEO, Edward J. Novak, to cause physicians at Sacred Heart and its affiliated clinics to refer patients to Superior. Superior provided incentives to employees at Sacred Heart and itsa affiliated clinics in order to induce referrals of home health service patients who were beneficiaries of federal and state health programs, including Medicare and Medicaid. This referral arrangement violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), the Illinois Public Aid Code (Vendor Fraud and Kickbacks), 305 ILCS 5/8A-3(b) and (c). The named physicians, who worked at Sacred Heart and its affiliated clinics, referred all of their home health patients to Superior, a related entity, in violation of the Stark Law (Stark II), 42 USC § 1395nn.

2

5.     Superior was required to adhere to federal and state statutes and regulations governing Medicare and Medicaid home health services, including requirements that Superior both receive patient referrals from qualified physicians and properly transfer patients already registered with another home health agency. In addition, Superior was required to provide appropriate home health services, including: performing timely assessments and reassessments of referred patients; submitting claims to federal and state government health care programs for home health services actually provided; and otherwise adhere to federal and state statutes and regulations governing Medicare and Medicaid programs, including compliance with the federal and state anti-kickback statutes and the Stark Law (Stark II).

6.     Defendant Superior failed to adhere to these standards by: receiving virtually all of their patient referrals from unqualified Sacred Heart Hospital–affiliated physicians; rendering home health services to Medicare and/or Medicaid patients referred by unqualified physicians; improperly transferring to Superior Home Health patients who were already registered with another home health agency (at times by deception); failing to provide appropriate services, including required patient assessments and skilled nursing services for which Superior was being paid by the United States and/or the State of Illinois; and creating false records in an attempt to conceal these and other systemic failures.

7.     Defendant Superior Home Health and/or Defendant Sacred Heart Hospital also violated the federal False Claims Act (federal FCA), 31 U.S.C. § 3729 et seq., and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, et. seq. Knowing that they were ineligible for the payments demanded from state and federal health care programs due to violations of the federal and state anti-kickback statutes and the Stark

3

Law, Defendants submitted claims for reimbursement to federal and state health care programs, including Medicare and Medicaid, related to these illegal patient referrals. Defendants also created, used, or caused to be made or used false records in support of these false claims.

8.     All Defendants participated in the illegal kickback arrangement between Superior Home Health and Sacred Heart, and so violated the federal FCA, 31 U.S.C. § 3729(a)(3), and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3(a)(3) by conspiring to defraud the federal government and/or the State of Illinois by getting false or fraudulent claims allowed or paid by Medicare, Medicaid, and other federal and/or state funded health programs.

9.     The concern with illegal referral incentives like those employed by Defendant Superior is that they interfere with the physician's judgment of what is the most appropriate care for a patient.

10.    These illegal kickback programs can inflate costs to federal and state health care programs (Medicare, Medicaid, etc.) by causing physicians to overuse or to inappropriately use the services of a particular health care services provider.

11.    In addition, unlawful incentives may result in the delivery of inappropriate care to federal and state health care program beneficiaries by inducing the physician to refer patients to the provider of designated health services providing financial incentives, rather than to another provider offering the best or most appropriate care for that patient.

12.    Of even greater concern, Medicare and Medicaid home health service providers serve the most vulnerable members of the community – the aged and infirm.

4

Failure of home health services providers (home health agencies) to adhere to federal and state laws and regulations governing state- and federally-funded home health services can put the safety of beneficiaries at risk and may result in the infirm and homebound being deprived of health care altogether.

13.     The Defendants' fraudulent conduct negatively affected the quality of care Superior's home health patients received. Defendant Superior lacked adequate staff, including registered nurses, to provide appropriate home health services to all of the patients improperly referred by Sacred Heart-affiliated physicians. Superior's management operated the agency in order to maximize claims and often delayed – and at times denied – care to Superior's aged and infirm patients. Defendant Superior conducted its home health business toward the systematic falsification of records in order to receive the maximum Medicare and Medicaid reimbursements, including billing for care which Superior never provided to the elderly patients. Defendant Superior lags far behind both state and federal averages for the percentage of Medicare and Medicaid patients under its care who are able to remain at home following an episode of home health services.

## II.     JURISDICTION AND VENUE

14.     This action arises under the laws of the United States to redress violations of the False Claims Act, 31 U.S.C. §3729 *et seq.*, the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. §1395nn.

15.     Subject-matter jurisdiction is conferred by 31 U.S.C. §3732(a) and 28 U.S.C. §1331.

16.     The Court has jurisdiction over Defendants' violations of the Illinois Whistleblower Reward and Protection Act pursuant to 31 U.S.C. §3732(b) because

Defendants' violations of both the state and the federal false claims statutes arise from the same transactions or occurrences. The Court also has pendant jurisdiction over Defendants' Illinois Whistleblower Reward and Protection Act because these violations and Defendants' violations of the federal FCA arise out of a common nucleus of operative fact.

17.     The Court has personal jurisdiction over all of the Defendants because they are all located within the Northern District of Illinois and act as providers of health care services and products to federal and state health care program beneficiaries, including Medicare and Medicaid beneficiaries, within the Northern District of Illinois. Each Defendant regularly performs healthcare services and submits claims for payment to federal and state health care programs, including, but not limited to, Medicare and Medicaid, and accordingly, is subject to the jurisdiction of this Court

18.     Venue lies under 28 U.S.C. § 1391(b), (c), and 31 U.S.C. §3732 (a) because Defendants transact business within this district and the facts forming the basis of this Complaint occurred within this district. Intradistrict venue is appropriate because Defendants maintain an office in Chicago and provide home health services to beneficiaries of state and federal health care programs, including Medicare and Medicaid, who reside in Cook County, Illinois.

19.     The facts and circumstances of the Defendants' violations of the federal False Claim Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

6

20.     The facts and circumstances of the Defendants' violations of the Illinois Whistleblower Reward and Protection Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any legislative, administrative, or Auditor General's report, hearing, audit, or investigation, or in the news media.

21.     Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the False Claims Act, and she has provided disclosure of the allegations of this Complaint to the United States prior to filing.

22.     Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the Illinois Whistleblower Reward and Protection Act, and immediately upon filing the Complaint, Relator will provide the State of Illinois with a copy of this Complaint and written disclosure of substantially all the material evidence and information Relator possesses.

III.    **PARTIES**

23.     The real parties in interest to the claims set forth herein are the United States of America and the State of Illinois.

24.     Relator Laura Litterio is a resident of Illinois and a citizen of the United States.

25.     Ms. Litterio was employed by Superior from November 2004 through November 2006, and for most of that time, she worked in Superior's administrative offices as an intake coordinator.   Her job was to enter patient information into Superior's system and determine whether referred patients were Medicare and/or Medicaid eligible.

26.     Defendant Superior Home Health, LLC, a/k/a/ G.O.L.D.E.N. Light (hereafter "Superior") is an Illinois corporation whose principal place of business is located at 4054 W. North Ave, Chicago, Illinois 60639.

27.     Defendant Superior is a for-profit home health agency, Medicare/Medicaid Certified: 2003/ No.147733. Serving hundreds of homebound elderly patients in Chicago's poorest neighborhoods, Superior is one of Illinois largest providers of HHS, having reported, for 2006, treating 724 HHA patients and making more than 37,000 home health agency visits that were covered by Medicare Parts A or B. In 2006, Superior received more than $5 million in Medicare funds.

28.     Defendant Edward J. Novak is the President and Registered Agent for Superior Home Health, LLC, 3240 W Franklin Blvd., Chicago, IL 60624. Upon information and belief, Novak has served in these capacities since Defendant Superior's formation in 2003 and he was the sole source of funding at Defendant Superior's inception.

29.     Defendant West Side Community Hospital, Inc. d/b/a Sacred Heart Hospital ("Sacred Heart"), is an Illinois corporation with its principal place of business located at 3240 W Franklin Blvd, Chicago, Illinois 60624.

30.     Defendant Sacred Heart is a 119-bed in-patient acute care facility, Medicare and Medicaid certified: No. 140151, which also runs approximately five affiliated clinics, including Bethel Clinic, Kedzie Clinic, and GOLDEN Light Clinic. Upon information and belief, Sacred Heart and its affiliated clinics provide health care services to a predominately elderly patient population on the west side of Chicago.

8

31.     Defendant Edward J. Novak is the President and Chief Executive Officer of Defendant Sacred Heart. Upon information and belief, Novak has held this position since he led a group of investors to acquire Sacred Heart Hospital in 1988.

32.     Defendant Sacred Heart and its affiliated clinics have a financial relationship with Defendant Superior through Defendant Novak's common ownership and leadership of the two entities.

33.     Defendant Bashi Bandari, MD, is a family physician working at Golden Light Clinic, a facility, upon information and belief, owned and operated by Defendant Sacred Heart. Dr. Bandari's principal place of business is located at 1111 Superior Street, Suite 403, Melrose Park, IL 60160.

34.     Defendant James M. Caruso, M.D., is a physician working at the Kedzie Clinic, a facility, upon information and belief, owned and operated by Defendant Sacred Heart. Dr. Caruso's principal place of business is located at 800 Kedzie Avenue, Chicago, IL 60651.

35.     Defendants Bashi Bandari, M.D., and James Caruso, M.D. were employed by Defendant Sacred Heart and/or its affiliated clinics, upon information and belief, since 2003, and since then they have referred many patients to Defendant Superior.

## IV.     FACTS

## A.     Background of Federal and State-Funded Health Insurance Programs

36.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people

9

under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

37.     Medicare has two parts: Part A, the Basic Plan of Hospital Insurance; and Part B, which covers physicians' services and certain other medical services not covered by Part A.

38.     Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

39.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care. It also covers some other medical services that Part A doesn't cover (i.e., physical and occupational therapist services, etc.). Part B helps pay for covered health services and supplies when they are medically necessary.

40.     Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

41.     The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

42.    Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

43.    Under Medicare Part A, contractors serve as "fiscal intermediaries" (FIs), administering Medicare in accordance with rules developed by the Health Care Financing Administration ("HCFA").

44.    Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

45.    The principal function of both intermediaries and carriers is to make and audit payments for Medicare services to assure that federal funds are spent properly.

46.    To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

47.    Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program assists the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

11

48.     Medicaid is a cooperative federal-state public assistance program serving needy families, children, and pregnant women, as well as the aged, blind, or disabled persons, which is administered by the states. The medical assistance programs under the Illinois Public Aid Code and Titles XIX and XXI of the U. S. Social Security Act (Illinois Medicaid) are administered by the Illinois Department of Healthcare and Family Services ("Illinois HFS"), and specifically by the Division of Medical Programs within Illinois HFS. Illinois HFS administers that state's Medicaid program, including the provision of home health services to qualified beneficiaries. 305 ILCS 5/5-5.

49.     While state agencies administer Medicaid programs, funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. 42 USC §1396a(a)(2).   Federal support for Medicaid is significant. For example, the federal government provides 50% of the funding for Illinois Medicaid, the remaining 50% of funds is received from the state.

50.     Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

51.     However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

12

52.　According to Illinois HFS, about 2.2 million people (low-income parents, children and people who are blind or disabled) were covered by Illinois Medicaid in fiscal year 2007. The Illinois Medicaid program pays for hospital services, doctor visits, prescriptions, home health services, nursing home care and other healthcare needs. The elderly, blind and disabled that are in poorer health comprise a small component of Medicaid beneficiaries, but they receive the greatest proportion (65%) of Illinois Medicaid funds.

53.　The complexity and financial magnitude of federal and state health care programs, including the Medicare and Medicaid programs, create the incentive and opportunity for pervasive fraud and abuse.

54.　Enacted in 1972, the main purpose of the federal Anti-Kickback Statute is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions.

55.　In order to deal with fraud and abuse of the Medicaid program by both providers and recipients, the Illinois legislature enacted 305 ILCS 5/8A-3(b) and (c) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks), which specifically prohibit both the offer and receipt of kickbacks related to Medicaid services.

56.　As a prerequisite to participating in federally-funded health care programs, providers expressly certify (or, through their participation in a federally-funded health care program, impliedly certify) their compliance with the Stark Law and the federal Anti-Kickback Statute.

57.　As a prerequisite to participating in the Illinois Medicaid program, providers must expressly certify (or, through their participation in the state-funded health

13

care program, impliedly certify) their compliance with federal and state laws governing Medicaid, including the Stark Law and both the federal Anti-Kickback Statute and the Illinois Public Aid Code (Vendor Fraud and Kickbacks).

**B.    Applicable Laws**

### 1.    The Stark Law

58.    Section 1877 of the Social Security Act, 42 U.S.C. §1395nn(a)(1), the Stark Law ("Stark II") prohibits referrals by physicians to entities which provide a designated health service (DHS) and to which the physician has a financial relationship.

59.    When a physician requests or establishes a plan of care "which includes the provision of the designated health service" this is a referral under Stark. 42 U.S.C. §1395nn (h)(5)(B).

60.    Stark II's prohibition centers on the connection between the referring physician and the entity receiving the referral. The term "financial relationship" includes indirect compensation arrangements between the physician and an entity that furnishes DHS. 42 CFR 411.354(a)(1)(ii).

61.    Stark II violators on both sides of the illegal referral relationship are subject to sanctions which include denials of payments, refunds of claims, and civil monetary penalties of up to $15,000 per designated health service based on an improper referral. 42 U.S.C. §1395nn(g).

### 2.    The Federal Anti-Kickback Statute

62.    The federal Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

14

(1)     to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

(2)     to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.

42 U.S.C. §1320a-7b(b)(1) and (2).

63.     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. §1320a-7b(b)(1).

64.     Violations of the federal Anti-Kickback Statute must be knowing and willful. 42 U.S.C. §1320a-7b(b)(1). An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks,* 157 F.3d 833, 837-8 (11th Cir. 1998).

65.     The federal Anti-Kickback Statute has been interpreted to cover any arrangement where <u>one</u> purpose of the remuneration was to induce further referrals. *United States v. Greber,* 760 F.2d 68 (3d Cir.), *cert. denied,* 474 U.S. 988 (1985). Moreover, "refer" and "recommend" as used in the Anti-Kickback Statute "may apply to physicians or others who refer, recommend, turn over, select, or give business to a particular recipient." *US v. Rogan,* 459 F. Supp 692, 715 (N.D. III. 2006), affirmed 517 F.3d 449; 2008 U.S. App. LEXIS 3508, citing *US v. Polin,* 194 F. 3d 863, 866-67 (7th Cir. 1999).

66.     A Violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the federal Anti-Kickback Statute *must* be excluded (*i.e.,* not

allowed to bill for any services rendered) from Federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1).

67.    Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the federal Anti-Kickback Statute, the Secretary may exclude that provider from federal health care programs for a discretionary period, and may impose administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

68.    HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse. See 42 C.F.R. §1001.952. However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection. The referral arrangements at issue here do not meet these safe harbor regulations.

### 3.    The Federal False Claims Act

69.    Section 3729 of the federal False Claim Act (federal FCA) provides, in pertinent part:

(a)    Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false claim allowed or paid; or (7) uses false documents to avoid an obligation to repay money to the Government, is liable to the United States

16

Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b)    For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

### 4.    The Illinois Public Aid Code (Vendor Fraud and Kickbacks)

70.    The Illinois Public Aid Code (Vendor Fraud and Kickbacks) makes it a crime to solicit or receive and to offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, in cash or in kind in connection with:

> (1)    The furnishing of items or services for which payment is or may be made in whole or in part under the Illinois Medicaid program; or

> (2)    The furnishing of items or services whose cost is or may be reported in whole or in part in order to obtain benefits or payments under the Illinois Medicaid program.

305 ILCS 5/8A-3(b) and (c).

71.    Unlike the federal Anti-Kickback Statute, the Illinois Public Aid Code (Vendor Fraud and Kickbacks) does not require that the prohibited conduct be "knowing" or "willful."

72.    . Violators of the Illinois Public Aid Code (Vendor Fraud and Kickbacks), 305 ILCS 5/8A-3(b) and (c), are subject to penalties and sanctions as provided in 305 ILCS 5/8A-6.

### 5.    The Illinois Whistleblower Reward and Protection Act

73.    Illinois Whistleblower Reward and Protection Act provides in pertinent part: (a) Any person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State; (3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid; is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person. A person violating subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages. 740 ILCS 175/3(a).

(b)    For purposes of the Illinois Whistleblower Reward and Protection Act, the terms the terms "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; or (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 740 ILCS 175/3(b).

18

### C.    Background of Medicare and Medicaid Home Health Services (HHS)

74.    Defendant Superior is a home health agency (HHA), as that term is defined by Sec. 1861(o) of the Social Security Act, 42 U.S.C. 1395x(o).

75.    Defendant Superior agreed to provide what the Social Security Act, 42 U.S.C. 1395x (m) calls "home health services" (HHS) to qualifying beneficiaries of the federal Medicare program. Superior also provided home health services, as that term is defined by Illinois statute, 210 ILCS 55/2.05; 77 Ill. Admin. Code Section 245.20, to qualifying beneficiaries of the Illinois Medicaid program.

76.    Section 1861(o) of the Social Security Act, 42 U.S.C. 1395x (m) provides that, in order for HHS to qualify for Medicare coverage, the beneficiary must generally be: confined to their home; under the care of a physician; under an established plan of care; and in need of skilled nursing services on an intermittent basis, or of skilled physical, speech, or occupational therapy.

77.    Under both Federal regulations and the laws of the State of Illinois, Medicare-certified Home Health Agencies (HHAs) participating in the Illinois Medicaid program must meet Medicare conditions of participation (Medicare COPS).

78.    Superior entered into provider agreements with Illinois HFS which required that Superior comply with all applicable federal and state laws and regulations, and pursuant to which Superior also agreed to be liable for the truth, accuracy, and completeness of all claims submitted.

79.    Potential beneficiaries under both Medicare and Illinois Medicaid HHS programs are identified and referred by their physicians to a home health agency (HHA).

19

80.     Where a referred patient was already registered with another HHA, Medicare statutes and regulations mandate that Superior follow appropriate transfer procedures, including obtaining the patient's consent to leave the existing HHA and transfer to Superior, before Superior could either claim the patient or provide HHS.

81.     Superior is required to assess each referred patient to determine the beneficiary's HHS eligibility, assess patient needs, and then provide appropriate HHS. Superior is required to make an initial assessment visit within 48 hours of referral, a comprehensive assessment upon admission, and necessary periodic reassessments at 60-day intervals and at discharge from home health care.

82.     When conducting patient assessments, Superior must use a standard set of data items, known as OASIS (Outcome and Assessment Information Set) for all Medicare and Medicaid patients receiving skilled care.

83.     Illinois HFS, as the state agency charged with receiving OASIS data from Illinois HHAs, plays a central role in both Medicare and Medicaid home health programs by virtue of its responsibility to collect, store and analyze OASIS data on behalf of CMS. 42 CFR 488.68(a).

84.     Superior was required to submit OASIS data directly to Illinois HFS (the state agency charged under federal statutes and regulations with administering OASIS data), which thereafter, forwards this data to the Centers for Medicare & Medicaid Services (CMS).

85.     Medicare regulations require that Illinois HFS, as the state agency receiving Superior's OASIS data submissions, review the HHA's (i.e., Superior's)

20

records to verify that they are consistent with OASIS data submitted by the HHA to Illinois HFS. 42 CFR 488.68(c).

86.     The federal government funds HHS for federal beneficiaries through hospital insurance (Medicare Parts A and B) according to the home health prospective payment system (HH PPS). Under HH PPS, Medicare pays the HHA a fixed amount for each 60-day interval ("episode") of home health care, which includes costs for all six home health disciplines (skilled nursing, home health aide, physical therapy, occupational therapy, speech-language pathology, medical social services), as well as costs associated with reporting OASIS data.

87.     The federal government uses OASIS data, in part, to determine Superior's per episode payment. Both federal and state governments use OASIS data to monitor and measure the quality of home health services.

88.     HHAs which serve a patient population with more serious health needs may be entitled to a higher fully adjusted episode rate payment from CMS and/or Medicaid. The fully adjusted episode rate under HH PPS takes into account the case-mix adjustment and outlier payments, both of which are based upon the severity of the patient's condition and the HHA's anticipated increased costs associated with providing appropriate care for more seriously ill patients.

89.     When a HHA provides fewer than five billable visits to a beneficiary during the 60-day episode, Medicare pays based on a low-utilization payment adjustment (LUPA) of a predetermined per-visit rate for that episode, rather than the (higher) full episode rate.

21

90.     The full episode payment to the HHA is made in two increments: at the beginning of the 60-day episode (after providing as little as one covered service), the HHA files a Request for Anticipated Payment (RAP) and CMS pays the HHA a substantial portion of the full episode rate for anticipated home health services. At the end of that 60-day episode, the HHA files a Final Claim (FC), and CMS then pays the HHA the remainder of the full episode payment. Even where the HHA knows or suspects that its final claim will be a LUPA or Partial Episode Payment (PEP, explained *infra*), it may make a RAP for the full episode, but then make appropriate adjustments when filing the FC, which reflects the care the HHA actually provided. The HHA submits Medicare HHS claims (RAPs, FCs, etc.) on Form HCFA-1450 (UB-92).

91.     CMS contracts with fiscal intermediaries (FIs), called "regional home health intermediaries" (RHHIs) to assist in administering Medicare's home health benefits program.

92.     Palmetto Government Benefit Administrator (Palmetto GBA) is the RHHI for Superior. In 2004, Palmetto GBA processed $3.2 million in Medicare payments to Superior. In 2006, Superior received $5.1 million from the federal government for Medicare home health services Superior claimed to have properly provided to Illinois Medicare beneficiaries.

93.     The Illinois Administrative Code defines "home health services" as: services provided to a person at his residence according to a plan of treatment for illness or infirmity prescribed by a physician or podiatrist. Such services include part-time and intermittent nursing services and other therapeutic services such as physical

22

therapy, occupational therapy, speech therapy, medical social services or services provided by a home health aide. 77 Ill. Admin. Code Section 245.20; 210 ILCS 55/2.05.

94.     As CMS requires for Medicare claims, Illinois HFS requires that the HHA submit a provider plan of care (HCFA Form 485) established by the patient's practitioner and reviewed every 60 days. Illinois HFS Handbook for Home Health Agencies, R-203.1.

95.     Illinois Medicaid HHS providers, including Superior, submit claims for reimbursement on Form HFS 2212 (health agency invoice, sometimes referred as "DPA 2212"), either on paper or electronically. Illinois HFS Handbook for Home Health Agencies, R-202.31. Form HFS 2212 requires accurate data reporting. Illinois Medicaid Home Health Services Handbook, Ch 136, Fraud.

96.     When making a claim for Medicaid payments on HFS form 2212, Superior must report many of the same data items reported when submitting RAPs and FCs under the Medicare program: OASIS data items; the name of the referring practitioner (item 12); the primary diagnosis (item 22); the date, category, place of service, and time spent rendering services (item 28). When Superior provides HHS to a Medicaid patient following a hospital discharge, the date of discharge must be reported because no prior approval is needed for home health services provided within 60 days of discharge.

97.     Illinois Medicaid-funded HHS program differs from the federal Medicare HHS program in several respects: the HHA need not obtain prior approval for home health services rendered within 60 days of an inpatient hospital discharge – otherwise, the HHA must get approval before rendering services; the Medicaid participant does not

23

have to be homebound to receive home health services; and Illinois Medicaid pays the HHA for home health services provided based on an all-inclusive per visit rate.

98.    In 2004, for example, the State of Illinois and the federal government, through Illinois HFS, processed $64,000 in Medicaid payments to Superior for HHS which Superior reported it had provided to qualified Illinois Medicaid beneficiaries.

**D.    Superior and Sacred Heart Physicians Engaged in an Improper Referral Relationship Which Violated the Stark Law (Stark II).**

99.    Superior and Sacred Heart physicians engaged in inappropriate referral relationship in violation of the Section 1877 of the Social Security Act, 42 U.S.C. §1395nn(a)(1), the Stark Law ("Stark II") which prohibits referrals by physicians to entities which provide a designated health service (DHS) and to which the physician has a financial relationship.

100.    When a physician requests or establishes a plan of care "which includes the provision of the designated health service" this is a referral under Stark II. 42 U.S.C. §1395nn (h)(5)(B).

101.    Stark II's prohibition centers on the connection between the referring physician and the entity receiving the referral. The term "financial relationship" includes indirect compensation arrangements between the physician and an entity that furnishes DHS. 42 CFR 411.354(a)(1)(ii).

102.    The Sacred Heart-affiliated physicians have an indirect compensation arrangement with Superior, the entity furnishing DHS (home health services under Medicare and Medicaid) because between the referring Sacred Heart physicians and Superior (the entity receiving the referral and providing the DHS) there is an "unbroken

chain" of at least one person (Defendant Novak) who has an ownership or investment interest in both entities. 42 CFR 411.354(c)(2)(i).

103. The Sacred Heart physicians' direct compensation with Sacred Heart (their very employment) depends upon the physician's referral of all home health patients to Superior. 42 CFR 411.354(c)(2)(ii).

104. For the duration of Relator's employment, Sacred Heart required the physicians employed at Sacred Heart and its affiliated clinics to refer all home health patients to Superior.

105. Sacred Heart physicians who referred patients to Superior for HHS included:

| Physician | Referring from |
|---|---|
| Bashi Bandari, MD | Sacred Heart Hospital/Golden Light Clinic |
| James Caruso, MD | Kedzie Clinic/ Golden Light Clinic |
| Dalmacio B. Cusi, MD | Golden Light Clinic |
| Deenadayal Gaddam, MD | Sacred Heart Hospital |
| Eliyazar Gaddam, MD | Golden Light Clinic |
| Rhonda Gans, DO | Bethel Clinic/ Golden Light Clinic |
| Aisha M. Jaleel, MD | Sacred Heart Hospital/ Golden Light Clinic/ Kedzie Clinic/ Bethel Clinic |
| Ramon E. Mella, MD | Golden Light Clinic/ Kedzie Clinic/Bethel Clinic |

106. Defendant Superior (the entity furnishing DHS) has actual knowledge of the policy of Defendants Sacred Heart and Novak requiring referrals of home health services to Defendant Superior and the fact that physicians who refuse to do so risk termination. 42 CFR 411.354(c)(2)(iii).

107. Defendant Sacred Heart Hospital reports that it provides home health services "under arrangement." Upon information and belief, Sacred Heart does not provide these services under arrangement, they are provided by Defendant Superior.